**Dated: September 24, 2010**

**The following is ORDERED:**



Tom R. Cornish
UNITED STATES BANKRUPTCY JUDGE

_____

NOT FOR PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

In Re:

**LaVelda Stuart**

       **Debtor.**

**Case No. 09-80388-TRC**
**Chapter 7**

**LaVelda Stuart**
       **Plaintiff**

**vs.**

**Case No. 09-8022-TRC**

**United States of America, ex rel**
**Farm Service Agency**

       **Defendant.**

## OPINION

On the 25th day of May, 2010, this matter came on for trial. Appearing on behalf of Plaintiff was Thomas R. Mayer. Cheryl R. Triplett, Assistant United States Attorney appeared for Defendant. The Court took this matter under advisement and now enters its findings of fact and conclusions of law in conformity with Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant

to 28 U.S.C. § 1334(b), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). It is this Court's decision that the 2003 mortgage on Plaintiff's home in Rustic Acres, Idabel, Oklahoma, should be set aside, but that FSA holds a valid mortgage on her homestead pursuant to the 2004 transaction.

<u>FINDINGS OF FACT</u>

Plaintiff filed her Chapter 7 bankruptcy on March 18, 2009. Prior to that time, she borrowed funds from Defendant on three separate occasions to finance three different transactions. Most of the testimony at trial centered around the second transaction, which took place in the fall of 2003, and involved the purchase of a chicken farm in McCurtain County, Oklahoma ("the chicken farm"), previously owned and mortgaged by her son and daughter-in-law.

At all times relevant to these transactions, Plaintiff was a real estate agent working in Idabel, Oklahoma. She worked as a realtor from 1998 to 2007, and estimated that she had attended between 65 and 70 real estate closings, including some involving FSA loans. Plaintiff's son and daughter-in-law operated two chicken farms for Tyson. Tyson required that they make $100,000 in upgrades and improvements to the chicken farms in order to continue under contract with Tyson. They could not afford to do that so Plaintiff agreed to take over one of the farms and obtain money from FSA to fund the required improvements. At the time, Plaintiff owned a home in Idabel, Oklahoma, in the Rustic Acres development, with an address of 102 Sherry Lane ("homestead"). She owned this home free and clear. She also owned rental properties. She purchased the chicken farm through a loan for $235,280.89 from Central Bank of Enid, and granted it the first mortgage on the farm. She then assumed a loan from FSA for $104,719.11 to be used to fund the required improvements to the chicken farm, granting it a second mortgage on the farm. The FSA mortgage also included her

home, although she claimed to be unaware of that. She received a real estate commission of $10,000 at the closing, which she said was used to fund improvements to homes on the chicken farms.

Plaintiff's negotiations with FSA were through Karen Matlock, Farm Loan Manager for McCurtain County. Matlock, now retired, testified that FSA regulations required that real estate worth the lesser of 150% of the loan amount or all real property owned be pledged by borrowers, if available, and that this was required on the 2003 and 2004 loans to Plaintiff. She said that FSA did not check to see if there were other mortgages on property pledged, that no title work or appraisals were performed on additional security, and that it was very common for borrowers to mortgage their homesteads in order to qualify for FSA loans. She described the typical procedure for obtaining an FSA loan, and stated that this same procedure was followed when Plaintiff obtained her loans from FSA. There are several different interviews during the course of the transaction. In the interviews, Matlock explains the 150% security requirement, assists borrowers in filling out loan applications, reviews the financial statements and tax returns of the borrowers including cash flow, checks for farming experience, reviews property the borrower owns, and determines whether a borrower is qualified to obtain FSA funding. Once there is sufficient security of approximately 150% of the loan, Matlock's office prepares mortgage and loan documents, UCC-1 statements, and instructions to the closer. Legal descriptions of mortgaged property are always listed in a separate attachment to the mortgage since there is insufficient space on the front page of the mortgage to include them there. For certain loans, the borrowers select the closer, and Matlock sends the loan documents and instructions to that person. After the documents are signed and recorded, they are returned to FSA. For cattle loans, FSA prepares all documents, and the closing is held at FSA offices. The borrower is then responsible for recording the note and mortgage.

Matlock testified that Plaintiff had loans with FSA beginning in 2000 when she purchased a poultry farm. Plaintiff pledged her homestead and the farm operation as security for that loan. The loan was later assumed by someone else and FSA released its lien on Plaintiff's homestead.

Plaintiff's second transaction was in 2003 to purchase another chicken farm and obtain a Farm Ownership Loan. Matlock was absolutely certain that she told Plaintiff FSA was taking a mortgage on her homestead. Matlock recalled that Plaintiff had a contract to sell her rental property in 2003 and did not want to jeopardize that sale by pledging it for the FSA loan. So, she agreed to pledge her homestead instead to meet FSA's requirement of additional security. On December 8, 2003, two days before closing, Plaintiff faxed Matlock a document from the McCurtain County Assessor's office that included the legal description of the homestead. Matlock stated that this information was given so that it could be included in the attachment to the FSA mortgage that included the legal descriptions of the chicken farm and homestead. Matlock provided Loan Closing Instructions and Loan Closing Statement to Don Shaw, a local attorney whom Plaintiff selected to be the closing agent for this transaction. Attachment "A" to this document included this statement: "Please note that FSA is taking the best lien obtainable on non farm tract with no title work required." Matlock did not attend the closing on December 10, 2003.

The final loan Plaintiff received from FSA occurred in October of 2004, and was an Operating Loan in the amount of $200,000, used for the purchase of cattle. FSA required 150% in pledged assets, so Plaintiff's homestead was mortgaged. Plaintiff executed a new promissory note and new mortgage. The promissory note consisted of three pages. Plaintiff only signed the last page where indicated. She did not initial the other pages. The mortgage consisted of six pages. The first page identified two promissory notes, one for $104,719.00, dated December 10, 2003, and the other

for $200,000 dated October 21, 2004. The first page also included a small space to insert the legal description of any real estate being mortgaged. Like the 2003 mortgage, the 2004 mortgage identifies the real estate as being in McCurtain County and states: "See attached Exhibit A for legal description." This mortgage includes two attachments: one is Attachment "A" (identified as Exhibit A on page 1 of the mortgage), which contains the legal descriptions of the Farm and homestead, and the other is an "Extension of Lien Rider," which is signed by Plaintiff. The Lien Rider states that it extends the original assumption agreement and continues the mortgage lien dated 12/11/2003. Plaintiff either signed or initialed and dated each page except page six, the page with the legal descriptions of the property mortgaged. "L. Stuart" is typed underneath the legal descriptions on page six. Matlock testified that she had several conversations with Plaintiff regarding this transaction, including informing Plaintiff that she must mortgage her homestead and the chicken farm to gain loan approval since the loan required security valued at 150 percent of the loan proceeds.

Don Shaw testified that he prepared the title opinion on the chicken farm for Plaintiff's 2003 loan and attended the closing, although he did not specifically remember the closing. He has been an attorney for thirty-five years, and is a sole practitioner in Idabel, Oklahoma. Seventy percent of his law practice is devoted to preparing title opinions and handling real estate closings. He estimated that he averages three closings per month for governmental agencies such as FSA. Shaw has known Plaintiff for approximately fifteen years and has worked with her on previous real estate closings. Plaintiff selected him to handle the 2003 closing.

Shaw noted a number of unusual occurrences with the 2003 closing. Shaw's normal procedure was to set up a file for this transaction, yet he could not find one when he searched his

office.  He would have reviewed documents from both the first mortgagee, Central National Bank of Enid, and the FSA, and would have reviewed them with Plaintiff both prior to and during the closing.  In this particular case, he acknowledged that he received from FSA its Loan Closing Instructions and Loan Closing Statement prior to closing, with the attachment noting that FSA was taking a lien on non farm property.  However, during his review of the FSA loan documents, Shaw did not notice that FSA was taking a mortgage on Plaintiff's homestead.  If he had, he would have brought this to Plaintiff's attention.  He stated that in his experience with FSA loans, it was very rare for it to take a mortgage on the borrower's homestead or non-farm property.  He did not perform a title search on her homestead property, so he did not know whether a mortgage was filed and released on that property by FSA for Plaintiff's first loan transaction in 2000.

Two closings were held on December 10, 2003: the first was for the purchase of the chicken farm from Plaintiff's son and daughter-in-law, which was financed by Central National Bank of Enid; the second was the FSA note and mortgage.  During the second closing, Shaw did not notice that FSA was taking a mortgage on Plaintiff's homestead.  He estimated that Plaintiff signed or initialed approximately thirty pages during each closing, but that no Truth-in-Lending Disclosures were signed at the FSA closing.  He also testified that Plaintiff had no three-day right of rescission on the FSA mortgage. Shaw's normal procedure was to have the buyer review, then sign or initial each page of the closing documents.  Shaw did not know why Plaintiff's initials were on other pages of the FSA mortgage, but not on Attachment "A" to the mortgage, which included the legal description of the mortgaged chicken farm and Plaintiff's homestead.  One explanation was that there was no place on that page specifically for her initials, and the page already contained her first initial and last name typed below the legal description of her homestead.  However, Shaw stated that

he normally would have had a buyer initial a page even if there was no specified place on the page for them to do so. Plaintiff also signed a Financing Statement for FSA, which included as collateral various items used in the chicken operation and Attachment "A." Attachment "A" only contained the legal description of the chicken farm, not Plaintiff's homestead. Shaw testified that he would have expected Attachment "A" to be the same for the mortgage and the financing statement. Plaintiff did not initial Attachment "A" to the Financing Statement.

The FSA documents were prepared by FSA personnel, and included in a packet of documents provided to Shaw. Plaintiff signed the documents on December 10, 2003, and Shaw recorded them about 3:00 p.m. on December 11, 2003. His normal practice was to record documents the same day as the closing, or first thing the next day. He could not recall why he waited longer than usual to record the documents from Plaintiff's closings.

Although Shaw thought that there were several unusual occurrences in this transaction, he believed FSA's mortgage on Plaintiff's home was valid. He stated that Plaintiff was an experienced realtor who should have recognized that part of the legal description included her homestead and realized that she was giving a mortgage on it. He ruled out the possibility that Attachment "A" to the mortgage was not included in the packet from FSA or that the documents were somehow altered or substituted between the closing and recording. The documents were in his possession during that time. He also stated that the lack of Plaintiff's initials on Attachment "A," or any page, did not affect the legal validity of the mortgage. If asked to give a legal opinion regarding the validity of the mortgage on Plaintiff's home he would state that it was legal and valid. Shaw was unaware if Plaintiff suffered from any financial stress, duress, or time pressures during the 2003 transaction.

Stephen Gregory, Farm Loan Specialist for the United States Department of Agriculture,

Farm Services Administration, and FSA's Director of Legal Servicing for the State of Oklahoma, testified regarding his contact with Plaintiff in 2008, and FSA procedures. Plaintiff called him seeking information on how to avoid foreclosure on her home. Their conversation was lengthy. Gregory advised that she could purchase the home for a certain value, but told the Court that he probably also advised Plaintiff that FSA would not release any property securing her loans because of a sizeable number of missing cattle that secured her 2004 loan as well as an FSA loan with her son. Although Plaintiff eventually accounted for all of the cattle, he was not sure who was the actual owner of the cattle: Plaintiff or her son. FSA lost approximately $70,000 on the cattle loans. FSA gave her notice of her administrative rights, which included various options consisting of loan deferments, restructuring, rights to appeal and mediation. Plaintiff did not respond to that notice. Gregory sent Plaintiff a copy of a November 2007 appraisal on her homestead, which was likely prepared at the direction of the local FSA office because of the deteriorating status of her loans. The appraised value of her homestead at that time was $130,000.

Gregory explained that the reason for the requirement that 150% of the loan value be given as security is because of the favorable terms offered to borrowers by the FSA, such as 100% financing and low interest rates. He also testified that Plaintiff was not entitled to a three day right to rescind her FSA loans because they did not qualify for that treatment under the Con Act (Consolidated Farm and Rural Development Act), the authorizing statute for the U.S. Department of Agriculture's agricultural and rural development lending programs. He explained that there is no three day right of rescission available on any homestead securing loans funded through the authority of the Con Act. He also testified that Plaintiff does not live in the homestead but leases it to someone else.

Gregory stated that the chicken farm was foreclosed upon by the first mortgagee, Central Bank, and that it purchased the property at the Sheriff's Sale. He said that FSA considered bidding on the chicken farm but that the case did not fit within FSA's requirements. FSA received nothing from the sale of the chicken farm.

Plaintiff testified that she purchased the home in Rustic Acres in 1998, and although she does not live there presently, she still considers it to be her home. Unable to find employment in the Idabel area, she currently works as a customer service representative for Baker-Hughes Company in Claremore, Oklahoma, and lives there with her thirteen year old son. She is leasing her Rustic Acres home to someone else until she can find employment in Idabel and return to that home.

Plaintiff testified that she was an experienced realtor who participated in many closings with FSA. Her real estate career existed from 1998 through 2007. She primarily officed in Idabel with Butler Real Estate Agency but also spent a few years in the Bartlesville area working for ReMax Realtors. She left the real estate business in 2007 because of declining sales and the death of the owner of the real estate agency for whom she worked. When questioned by FSA's attorney, Plaintiff admitted that she and her boss had been sanctioned and fined by the Board of Realtors for omitting a disclosure while working for Butler Real Estate.

Plaintiff explained that her primary purpose for borrowing funds from FSA in 2003 and 2004 was to help her son and daughter-in-law keep their chicken farm operation. When questioned by FSA's attorney about the propriety of Plaintiff borrowing funds for her son based upon her credit status, Plaintiff stated that Matlock always knew this was her purpose. She insisted that Matlock never told her that her home would be mortgaged. Had she or her son realized that her home was to secure the 2003 and 2004 notes with FSA, Plaintiff testified that she never would have gone

through with the loans. However, neither she nor her son and daughter-in-law had other financing options available. She was not aware that her home had been mortgaged in the 2000 loan transaction. And, if it had been previously mortgaged, Plaintiff thought Matlock would have possessed the legal description from Plaintiff's home, and should not have needed to ask for it again in 2003.

Plaintiff explained that the loans she received from FSA were "50/50" loans, designed to help beginning farmers. She stated that she had closed about ten of these type of loans with Matlock. To gain a 50/50 loan, Plaintiff had to provide three letters denying her credit. In 2003, she believed that she no longer qualified for the 50/50 loan because she owned her home free and clear and her income was too high. However, Matlock explained how she could get financing from FSA to save the poultry farms for her son and daughter-in-law. To gain financing in 2003, at Matlock's request, Plaintiff faxed a copy of the legal description of her homestead, a statement of real estate sales and commission for October 1 through December 1, 2003, and a letter from Plaintiff to Matlock regarding rental property she owned at the time. The sales and commissions statement included the chicken farm sale to Plaintiff by her son and daughter-in-law and the commission of $10,000 for that sale, which represented a little more than half of the total commissions she earned during the period. Plaintiff believed that the purpose for faxing the legal description on her home was simply background information required by FSA to process her loan application. She also stated that there was never a 150% real estate security requirement for the 50/50 loans with which she was involved as a realtor.

At the closing on December 10, 2003, Plaintiff stated that she signed and initialed every page that was presented to her. She testified that she did not see or sign Attachment "A" to FSA's

mortgage. She surmised that the page may have been left inside the packet of closing documents and not presented to her with the other documents that she signed or initialed, however she stated that she really had no idea how she and Shaw missed seeing the legal description of her homestead. She said she did not believe that FSA had defrauded her, but she did not believe that Attachment "A" was ever shown to her. If it had been, either she or Shaw would have seen it and stopped the transaction. She stated that she would not have borrowed the money if she had known it required her to mortgage her home. She admitted that she initialed the first page of the FSA mortgage, which specifically referenced the attached exhibit with the legal descriptions. Since she had attended approximately seventy-five closings during her career as a realtor, she stated that she probably would not have read every word in a mortgage, but she would have noticed if the legal description of her homestead was included in the papers she signed. She also said that she did not look for the legal description because it was not supposed to be included as security for the FSA loan. She did not receive a notice of a three day right of rescission of the mortgage on her homestead. She had no objection to FSA's claim to the chicken farm or cattle pledged on the 2003 and 2004 loans respectively, and did not question the validity of the mortgage on the chicken farm, even though that legal description was included on Attachment "A," along with the legal description of her home, which she neither signed nor initialed.

Plaintiff testified that she did initial Exhibit 'A' to the first mortgage to Central Bank, the legal description page, which only included the legal description of the chicken farm, not her homestead. This page had a short blank after the legal description with the word "initial" under it. Her initialing of the legal description page on the first mortgage was another reason why she believed that Attachment "A" to the FSA mortgages must have been altered or hidden in some way during

the closing. If she initialed the legal description of one mortgage, then why would she not have initialed the legal description of the other mortgage as well?

Plaintiff also testified regarding some of the circumstances surrounding her and her son's 2004 cattle loans and operations. She stated that they borrowed the funds so that her son could generate enough money to service the chicken farm loan, since the chicken operation could not sustain itself. She admitted that she attended the closing on the 2004 cattle loan in FSA offices. She corrected Matlock's testimony regarded signators to a checking account regarding the cattle loan. She reiterated that she would not have borrowed funds in 2004 had she known she was mortgaging her home. She told the Court that she was not claiming the mortgages were invalid because she failed to initial Attachment "A," but that FSA made a mistake in including her homestead in the mortgage.

She stated that the first time she realized her homestead was mortgaged was in 2006. She contacted various officials with FSA to try to resolve her financial problems.

Clay Combs, FSA Loan Specialist from Tishomingo, Oklahoma, testified regarding his involvement with Plaintiff's loans. Mr. Combs has been employed by FSA for twenty-eight years. He is assigned a fifteen county area in southeast Oklahoma. His job was to review loans processed by Matlock and approve or deny those loans. For Plaintiff to receive funds from FSA she was required to provide security for the loan and have sufficient cash flow to service the loan payments. His review of her file revealed that each of her three loans was a 150% loan, and each one was secured by her homestead. Although the loans could have been made without the pledge of a homestead, Combs stated that loan regulations required that FSA take a mortgage on any available property. He also noted that Plaintiff informed FSA of the property she owned. Combs did not meet

Plaintiff until April of 2007. His primary concern at that time was the cattle loans and issue of the sale of cattle by her son. He informed Plaintiff at that time that he did not have the authority to release her house from the mortgage, that only the state director could do that, and that compensation would be required.

Plaintiff filed for Chapter 7 bankruptcy on March 18, 2009. Gregory prepared the Proof of Claim for the FSA. It was filed on June 9, 2009, listing Plaintiff's total indebtedness of $211,494.78, including secured debt of $130,000 and unsecured debt of $81,494.78. The Proof of Claim identifies two promissory notes from Plaintiff: one dated 12-10-03 for $104,719.11, and the second dated 10-21-04 for $200,000. It also lists two real estate mortgages and several financing statements.

<u>CONCLUSIONS OF LAW</u>

Throughout the trial, FSA witnesses testified that FSA was required by federal regulations to obtain security equal to 150% of the loan values for both the 2003 and 2004 loans. Therefore, FSA was required to take a mortgage on Plaintiff's homestead. After the trial, the Court directed the parties to file post-trial briefs regarding the effect of 7 C.F.R.§ 1943.19(d)(3) (2003) on the loans. That regulation provides:

> A lien will not be taken on the applicant's personal residence and appurtenances, when the residence is located on a separate parcel and the farm tract being financed, improved, or otherwise used for collateral provides primary security for the loan(s).

In its post-trial brief, FSA acknowledges that, contrary to the representations of its witnesses to this Court, it was not required to take a mortgage on Plaintiff's home for the 2003 loan because the chicken farm provided sufficient security according to its regulations. Since the mortgage on her homestead was based upon a mutual mistake, it may be rescinded. *See Beck v. Reynolds,* 903 P.2d 317 (Okla. 1995). Therefore, this Court will rescind the 2003 mortgage as to Plaintiff's homestead

only.

However, FSA argues that it was allowed to take a mortgage on her homestead for the 2004 cattle Operating Loan, thus it still has a valid, enforceable mortgage on her homestead. A different regulation applied to Operating Loans: 7 C.F.R § 1941.19 (2004). This regulation required a mortgage on the applicant's personal residence if other security pledged for the loan did not equal 150 percent of the loan amount. A first lien will be taken on all chattel acquired with the loan proceeds. Additional security, including real estate, will be taken if the chattel purchased is not worth 150 percent of the funds loaned:

> (b) *Real Estate.* The loan approval official will require a lien on all or part of the applicant's real estate as security when chattel security alone is not at least equal to 150 percent of the amount of the loan . . .
>
> (c) *Exceptions.* The County Supervisor will clearly document in the file when security is not taken for any of the following reasons:
>
> .   .   .
>
> (4) A lien will not be taken on the applicant's personal residence and appurtenances, when the residence is located on a separate parcel and the farm tract(s) being used for collateral, in addition to any crops or chattels, meet the security requirement of at least equal to 150 percent of the loan.

FSA witnesses stated that the value of the cattle and the chicken farm did not equal 150 percent of $200,000; therefore, Plaintiff's homestead was required as additional security. Plaintiff did not dispute their testimony, nor did her post-trial brief offer any argument or authority regarding FSA's position that it was required to take a mortgage on her homestead. Therefore, the Court finds that it was proper pursuant to its loan regulations for FSA to require a mortgage on Plaintiff's homestead as security for the 2004 loan. The question before this Court, however, is whether the mortgage should be rescinded for other reasons.

Plaintiff argues that the mortgage on her home should be set aside for three reasons. First,

she argues that loans for which her home was mortgaged as security are subject to the Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA"), thus, FSA was required to inform Plaintiff of her right to rescind the mortgage on her home within three business days of the transaction. 15 U.S.C. § 1635(a). Second, she relies upon general principles of contract law to reform the mortgage. And, third, she relies upon Oklahoma's doctrine of economic duress, which allows a mortgage to be rescinded where it was obtained under undue pressure or duress. *See In re Carter*, 177 B.R. 951 (N.D. Okla. 1994).

A.    TILA Application

The TILA exempts transactions made "primarily for business, commercial, or agricultural purposes . . . ." 15 U.S.C. § 1603. *See Munk v. Fed. Land Bank of Wichita*, 791 F.2d 130 (10th Cir. 1986). By her own admission, Plaintiff's loans from FSA were for business purposes and/or agricultural purposes. Her stated purpose for obtaining these loans was that the proceeds would be used for business purposes, either as funding for the chicken farm or to purchase cattle. However, Plaintiff apparently believes that because her home is not physically adjacent to the chicken farm nor actually used as part of the chicken or cow operations that she was entitled to TILA notices of a right to rescind.

In determining whether a particular transaction is exempt from coverage under the TILA, the purpose of the transaction is controlling, not the purpose of the property or security that is pledged as security. *Gerasta v. Hibernia Nat'l Bank*, 411 F. Supp. 176 (E.D. La. 1975), affirmed in part, reversed in part on other grounds and remanded at 575 F.2d 580. The stated purpose of Plaintiff's loans was business or agricultural, thereby exempting them from the TILA. Therefore, Plaintiff may not rescind her loans with FSA under the TILA.

B.      Elements of a Valid Contract.

The essential elements for an enforceable contract under Oklahoma law are: 1) parties capable of contracting; 2) consent; 3) a lawful object; and 4) sufficient cause or consideration.  Okla. Stat. tit. 15, § 2.   There is no dispute regarding elements one and three, but Plaintiff argues that the second and fourth elements are absent.  She did not agree to the mortgage nor was it necessary for her to give a mortgage as the loans were adequately secured by other property.

The Court recognizes that Oklahoma requires  mutual consent, or a "meeting of the minds," for a valid contract to exist.  *Beck*,  903 P.2d at 319 (citations omitted).  A "meeting of the minds" is absent where there is a mutual mistake of fact.  *Hampton v. Surety Development Corp.*, 817 P.2d 1273, 1274 (Okla. 1991).  Consent gained on the basis of a mistake may invalidate a contract.  Okla. Stat. tit. 15, § 53.  Although Plaintiff claims that the mortgage on her homestead was obtained without her knowledge or consent, and that it was based upon a mistake, the Court does not find this to be the case.  It does not find Plaintiff's testimony to be credible.

As an experienced real estate agent, Plaintiff is a sophisticated borrower who could be characterized as an expert in real estate sales.  Her own witness, Don Shaw, also characterized her in this manner. With her education and knowledge of the real estate industry, including significant experience in sales financed by FSA, the requirements for securing those loans, and the large number of closings she has attended, she was very familiar with closing documents and the absolute necessity of reviewing those documents before signing them.  She stated that she reviewed every page of the closing documents at both the 2003 and 2004 closings - approximately sixty pages - with the exception of the two most critical pages: those containing the legal description of her home.  She also stated that she would have signed or initialed every page presented to her, yet she did not do this

on the promissory notes, leaving the Court to find that, contrary to her testimony, she was not consistent in signing or initialing each page, and that she may have simply looked for pages with a line requiring either her signature or initials, and ignored the rest. Thus, the Court believes that she was aware that her home was included in the mortgages, particularly in light of her professional knowledge and experience as a realtor.

Shaw, an experienced real estate attorney, testified that there is no legal requirement for every page of a mortgage to be signed or initialed for the mortgage to be valid. Matlock insisted that Plaintiff was informed on numerous occasions that her home was to be included in the 2003 and 2004 mortgages, and that she was certain Plaintiff understood that. Matlock's testimony is supported by the documents themselves. Plaintiff's letter to FSA in 2003 notifying it of the pending sale of rental property owned by Plaintiff, as well as the faxed legal description of the homestead from Plaintiff to Matlock support this Court's belief that Plaintiff was aware that additional security was needed for the 2003 loan and chose to mortgage her home rather than the rental property. The belief that Plaintiff was aware she was mortgaging her home in 2003 leads the Court to believe that Plaintiff also knew her home was mortgaged as part of the 2004 transaction.

Consent obtained through duress, menace, fraud, or undue influence may invalidate a contract. Okla. Stat. tit. 15, § 53. Plaintiff does not specifically allege that any of these causes exist. However, she did suggest that the legal description of her home must have been added after closings, otherwise she would have noticed it and would not have signed the mortgages. This implies that she believes there was fraud involved in these transactions.

However, there is absolutely no evidence that Attachment "A" was withheld from Plaintiff, or that the legal description to Plaintiff's home was somehow typed onto Attachment "A" during or

after the closings without Plaintiff's knowledge.  The evidence was that Plaintiff herself took the 2004 mortgage to be recorded in the land records.  Her theory that the page containing the legal descriptions was left in an envelope and not presented to her in the 2003 closing, but was somehow included in the right location when the mortgage was presented at the County Clerk's office for recordation, is implausible and self-serving.  It was also contradicted by Shaw.  She offered no explanation for how the legal description page was withheld or altered during the 2004 closing.  The book and page numbers assigned by the County Clerk to each page of the recorded mortgages correspond with the order of the original mortgages.  Further, the Court finds it highly unlikely that the same, critical page was left out of the pages presented to Plaintiff on two separate occasions: the 2003 closing attended by Don Shaw, and the 2004 closing held in FSA's offices.  Plaintiff offered no evidence of duress, menace or undue influence.  Based upon this Court's observance of the witnesses and in consideration of all of the testimony and evidence presented, the Court finds Plaintiff's testimony and theories to be self-serving and not credible.  Further, it finds that she executed the 2004  mortgage with actual knowledge and consent, free from duress, menace, fraud or undue influence.

The Court also finds that there was sufficient consideration for this contract.  Plaintiff did not refute defense witnesses who testified that there was insufficient value in the cattle and chicken farm pledged to reach 150 percent of the 2004 loan.  Generally, where there is any benefit to the promisor or there is a detriment to the promisee there is consideration for a contract.  *See Powers Restaurants, Inc. v. Garrison*, 465 P.2d 761 (Okla. 1970).  There is no dispute that Plaintiff received the proceeds from the FSA loans.  She also received favorable terms for the loan, and was able to secure financing from FSA.  She admitted that she had no other financing available to her.

Accordingly, this Court concludes that the elements required for a valid contract are present, and FSA's 2004 mortgage on her homestead is valid under Oklahoma law.

C.      Doctrine of Economic Duress.

Plaintiff argues that for equitable reasons, her mortgage should be set aside pursuant to Oklahoma's doctrine of economic duress. To prevail under this doctrine, Plaintiff must prove that: 1) the mortgage on her home was the result of a wrongful or unlawful act, initiated and committed with the knowledge of its adverse impact and for the purpose of coercion; 2) she had no reasonable alternative to the contract; and 3) the coercion caused harm to her. *In re Carter*, 177 B.R. 951, 957 (N.D. Okla. 1994) citing *Centric Corp. v. Morrison-Knudsen Co.*, 731 P.2d 411, 417 (Okla. 1986). This doctrine is available only where conventional remedies are unavailable, and its purpose is to prevent injustice. *Centric,* 731 P.2d at 414. Based upon the facts before it, this Court cannot conclude that FSA so deprived Plaintiff of her free will so as to leave her no adequate legal remedy or reasonable alternative but to grant the mortgage on her home. *See id.* at 416. Cases relying upon the doctrine of economic duress to invalidate a mortgage involve severe financial distress of the mortgagor, which effectively removes the element of choice in granting the mortgage. Plaintiff admits that this was not the case here. She stated that she did not have to take out these loans, but chose to do so. There was no evidence that Plaintiff was suffering severe financial distress when she signed the 2003 and 2004 mortgages. Plaintiff submitted financial statements reflecting that she had sufficient income and assets to secure the promissory notes she signed, as required by FSA. Apparently, her son and daughter-in-law were facing significant financial pressures as they tried to save their chicken farms and cattle operations; however, Plaintiff did not allege that she faced these same pressures.

The terms of the loans were not unreasonable or oppressive. FSA explained that it requires additional security for several reasons, including the favorable terms of its loans, and the small profit margin in farming. This Court does not believe that Plaintiff was unaware of the security required, or that she was under such financial pressure that she acted without proper information. Therefore, the elements of economic duress are not present, and the mortgage may not be rescinded.

## CONCLUSION

Based upon the above and foregoing findings of fact and conclusions of law, the Court will rescind the 2003 Mortgage as to Plaintiff's homestead in the Rustic Acres addition in the city of Idabel, Oklahoma, for the reason that additional security was not required on the 2003 loan. The Court also finds that FSA has a valid mortgage on Plaintiff's homestead pursuant to the 2004 cattle loan and mortgage and will not rescind that mortgage.

A separate judgment consistent with this Opinion is entered concurrently herewith.

### ###